JOHN MAHLER, APPELLANT, V. LYLE BELLIS, DOING BUSINESS AS L & B CONSTRUCTION COMPANY, APPELLEE.

435 N.W.2d 661

Filed February 17, 1989.    No. 86-950.

Kurt A. Hohenstein, of Rager & Hohenstein, P.C., for appellant.

William L. Binkard for appellee.

BOSLAUGH, CAPORALE, and GRANT, JJ., and BUCKLEY, D.J., and COLWELL, D.J., Retired.

BUCKLEY, D.J.

Plaintiff-appellant, John Mahler, hired defendant-appellee, Lyle Bellis, a construction contractor, to do some remodeling to plaintiff's house. The written contract involved the conversion of an existing garage into a room enlarged by a 12- by 20-foot addition.

During the construction, numerous problems arose, and this suit followed. Plaintiff alleged that the defendant did not perform in a workmanlike manner and did not follow the terms of the written contract, causing plaintiff to sustain damages to repair and replace defendant's faulty work.

Defendant denied plaintiff's allegations and by way of affirmative defense alleged that an accord and satisfaction was reached as to all of the disputes between the parties.

The case was tried to the court without a jury, resulting in a judgment for the defendant and a dismissal of plaintiff's petition. The trial court specifically found that "there was an accord and satisfaction as to all items of damage claimed by plaintiff other that [sic] the footings, the cracks in the drywall and the shingles." The court further found that as to those items, the plaintiff failed to establish either that the work was done improperly or in breach of the contract or that any damages resulted therefrom.

In a law action tried to the court, the findings of the trial court have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. In a nonjury law action, the evidence must be considered in the light most favorable to the successful party, with conflicts resolved in favor of the

successful party, who is entitled to the benefit of every inference which can be reasonably deduced from the evidence. *Nebraska State Bank v. Rasmussen*, 225 Neb. 81, 402 N.W.2d 688 (1987).

The contract was executed in July 1984, requiring payment totaling $15,036. Plaintiff paid $7,500 when the contract was executed; the balance was to be paid upon completion.

Plaintiff testified that after construction began, the first problem that arose concerned the footings for the addition. Defendant told him that as they were digging the footings they struck something in the ground, which concerned the plaintiff because it was in the area where he knew there was some type of sewage disposal system. Plaintiff said defendant told him there was no problem because what they encountered was solid and had not moved. Defendant then proceeded to pour the footings before they were inspected by the building inspectors. The room included a loft, and while it was being constructed, plaintiff noticed the roof sagging, whereupon construction was halted and plaintiff retained a structural engineer, who redesigned the loft support system. Construction then continued, and the balcony and supports were built according to the engineer's design.

About mid-August 1984, defendant said the project was finished and requested payment of the balance due under the contract. Plaintiff told him that several things had not been done at all or were not done properly. These included failure to form up some concrete put in next to the patio area, installation of a screen with holes, installation of a fireplace pipe with a color that did not match the color of existing pipe sections, failure to pay the costs for retaining the engineer to redesign the loft support system, failure to clean up tar and glue from the concrete floor, and failure to clean up the windows and woodwork. Plaintiff had also discussed with defendant his concern over the way that the new roof was tied into the existing structure; that it was just a piece of tin pounded down over the top of the shingles, which appeared very rough and unsightly. Defendant told him that it was the normal way to do that type of a tie-in and that he would not change it without waiving his guarantees.

Plaintiff testified that on August 31, 1984, the parties met to

discuss plaintiff's concerns just described, which plaintiff says were the only problems he was aware of at that time. They went over each item and the monetary impact on the contract. Some of the items plaintiff did not push further. The parties agreed that the contract price would be adjusted for the chimney pipe that plaintiff obtained and installed himself, for engineering costs, and for cleaning the concrete floor. The total adjustment was $600. Plaintiff paid defendant $1,500 at that meeting and paid the balance of the contract 2 to 3 weeks later.

Plaintiff contends that after the negotiated settlement, he encountered further problems not known to him or discussed on August 31, 1984, resulting from defendant's failure to complete work required by the contract or to complete it properly. The defendant's position is that all disputes were settled at the August 31 meeting, constituting a complete accord and satisfaction, but that if any items were not settled then, defendant's evidence more than supports the trial court's findings that no damages were sustained through any fault of defendant.

To constitute an accord and satisfaction there must be (1) a bona fide dispute between parties, (2) substitute performance tendered in full satisfaction of the claim, and (3) acceptance of the tendered performance. *Meyers v. Frohm Holdings, Inc.,* 211 Neb. 329, 318 N.W.2d 716 (1982).

The key element of accord and satisfaction is the intent of the parties, which, although as a general rule presents a question of fact, becomes a question of law when the evidence creates no conflict as to intent. *Rosenberg v. Lincoln Fed. Sav. & Loan Assn.,* 219 Neb. 689, 365 N.W.2d 809 (1985).

Defendant testified that the August 31 meeting resulted in a settlement of all of the plaintiff's complaints and that final payment by the plaintiff finalized the settlement and the matter was over. Plaintiff does not seek damages for any item he was aware of at the settlement meeting, but only those items he discovered afterward. Defendant admitted on cross-examination that none of these items were discussed. The evidence will not permit a finding that the parties intended that the August 31 meeting settled any items of damage other than those known by the plaintiff and considered by the parties at

that meeting. Therefore, there was no accord and satisfaction as to any of the items of damage claimed by the plaintiff in this suit. However, there is evidence that supports a finding for the defendant as to each element of damage. We take them up separately.

## UNEVENNESS OF THE FLOOR

The contract called for a water drain in the floor of the old garage to be closed and the floor area leveled. After the "settlement" meeting and while plaintiff was painting the room, he spilled some water which collected at the drain area. He offered no other evidence that the area had not been leveled as required by the contract and no evidence of the cost to do the work that defendant presumably failed to do. This item fails for lack of any evidence of damages.

## INSTALLATION OF DRYWALL

Plaintiff testified that the drywall was uneven. His engineer said that the variances he observed were not unusual and that the Sheetrock was in pretty good shape except for one area under one window on one side of the room, where it was not properly finished. Tom Kavanaugh, employed by a lumberyard as a contractor, salesperson, estimator, and designer, testified that the windows were constructed and installed in a workmanlike manner. Darrell Hackett, a carpenter who subcontracted most of the work from defendant, testified that he installed the Sheetrock and that all of his work was done in a workmanlike manner. There is sufficient evidence to support a finding for the defendant on this item.

## INADEQUATE FOOTINGS

Plaintiff dug under some footings and had them examined by the engineer, who felt they were shallow and extended over an underground obstruction or tank. The engineer took sightings then, and again in late May 1986, to determine if there was any settling. He found no changes of any significance and concluded that the footings, even if shallow, had not effected any settling of the house. The trial court found that "while the footings may not have been properly inspected prior to being poured, there is no evidence that they are inadequate, and there was no evidence that the structure was settling or would settle in the future." These findings are supported by the evidence.

## ROOF

Plaintiff examined the roof and discovered large areas where the shingles were not sealed together. He also observed on the gable end that the shingles were starting to rise off the edge. When plaintiff raised a shingle further, the nail along the edge popped out. The engineer examined the roof and found that nails seven-eighths inch in length were used. He gave his opinion that the nail must be long enough to penetrate the shingle thickness and go completely through the plywood sheeting beneath so that from the inside the tip of the shingle nail can be observed. Examining the inside, he found the extreme tip of only one nail, with no other nail penetration. He concluded that the shingle nails used were too short, subjecting the roof to being blown off in the wind. His remedy of the situation would entail removal and replacement of the shingles and the installation of a ridge ventilator to prevent accumulation of vapor underneath the plywood sheeting. His estimate of the cost to effectuate this repair was $2,610.

Marvin Simons, the roofer hired by defendant, testified that the roof was three tab shingles, 240 pound, with 15 pound felt underlay on a $1/2$-inch plywood base. He measured the thickness of two layers of shingles at a total of three-sixteenths of an inch and added approximately one thirty-second of an inch for the felt underlay. He concluded that the length of nail that was used would penetrate the shingles, felt, and just through the plywood. He felt that the point of the nail should not protrude through the bottom of the plywood because it would draw frost and would create a moisture problem. He concluded that the roof was installed in a reasonably workmanlike manner.

The trial court found that

> the Plaintiff has not established that the roof was installed in an improper manner, and, although there was some testimony that an improper length of nail was used in attaching the shingles to the roof, Plaintiff did not establish by a preponderance of the evidence that he has suffered any damage as a result thereof.

Although the evidence was in sharp conflict, there was sufficient competent evidence to support the trial court's

findings, and we cannot say they are clearly wrong.

## CRACKS IN WALLS

Several months after the project was finished, plaintiff noticed cracks in the drywall directly under the beams which were a part of the redesigned loft support system. They ran from the ridge beam to the floor of the loft, then underneath the loft, then directly down to the bottom of the drywall. The cracks were described at first as hairline but widening gradually to over a quarter of an inch, but thereafter fluctuating in width. The engineer described the cracks as being above the point where the support beam reaches the east and west walls. When asked on cross-examination what was causing the cracking in the Sheetrock, he answered,

> Well, speculate that temperature and humidity are combining to increase the dimensions of the ceiling over that area to the point that it pulls the sheet rock joints apart and the joints instead of being a straight up and down joint below the massive beam that goes like this, and that's what the crack does, it follows that.

The trial court found that

> while there does appear to be a problem with cracks in the dry wall installed, there is no evidence to establish that those cracks are as a result of the Defendant's failure to do his work in a workmanlike manner. The fault could just as well be laid to a change in the design of the structure.

The trial court's findings are not only permissible under the evidence, but are the only ones permitted. There was no evidence whatsoever that the cracks resulted from poor workmanship by defendant or that he failed to follow the requirements of the contract. Plaintiff did not want vertical support columns for the loft as originally planned by defendant. His engineer redesigned the horizontal beam to obtain the necessary support. If the cracks resulted from the beam design, such design was plaintiff's, not defendant's. The engineer's opinion of the cause of the cracking will not permit the conclusion that it resulted from any improper work of the defendant.

## CONCLUSION

Having examined the evidence and finding that there is

competent evidence to support a finding for the defendant as to every item of damage claimed by the plaintiff, we conclude that the judgment of the district court dismissing plaintiff's petition should be affirmed.

AFFIRMED.